## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ELI LILLY AND COMPANY, | Case No. 1:24-cv-1036 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| AGV SASON INC. D/B/A LUCY'S LASER & MEDSPA, | |
| Defendant. | |

## COMPLAINT FOR TRADEMARK INFRINGEMENT, FALSE ADVERTISING, FALSE DESIGNATION OF ORIGIN, <u>AND DECEPTIVE TRADE PRACTICES</u>

## INTRODUCTION

1.     This is an action to protect patients from unstudied, unapproved, and unsafe drugs masquerading as Plaintiff Eli Lilly and Company's ("Lilly") FDA-approved medicines for adults with type 2 diabetes, obesity, or excess weight and weight-related medical problems.  Defendant AGV Sason Inc. d/b/a Lucy's Laser & Medspa ("Defendant") has designed its website and advertising materials to deceive patients into thinking Defendant offers a way to obtain Lilly's clinically studied medicines, when in reality Defendant offers no such thing.[1]  Lilly therefore brings this action under federal and state law to protect patients from Defendant's dangerous, deceptive, and unlawful practices.

2.     For nearly 150 years, Lilly has worked tirelessly to develop and deliver trusted and innovative medicines that meet critical and unmet patient needs.  Lilly's proprietary MOUNJARO® and ZEPBOUND® are two such first-of-their-kind medicines, which are indicated for the serious conditions afflicting many tens of millions of Americans.  To advance treatment of these chronic conditions, Lilly used its extensive experience with world-class medicines to develop the brand-new class of GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) dual-receptor agonists, which includes tirzepatide, the active ingredient in Lilly's MOUNJARO® and ZEPBOUND®.  Lilly's MOUNJARO® and ZEPBOUND® are the only FDA-approved GLP-1/GIP medicines.

3.     Before obtaining FDA approval, Lilly's new medicines underwent years-long clinical trials, which tested them for safety, quality, and effectiveness on thousands of patients.  When approving these medicines, the FDA called Lilly's "novel" MOUNJARO® an "important

---

[1]     In support of this Complaint, Lilly's allegations are upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

advance" and observed that Lilly's ZEPBOUND® "addresses an unmet medical need." https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda-approves-novel-dual-targeted-treatment-type-2-diabetes (archived FDA MOUNJARO® approval press announcement); https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight-management (FDA ZEPBOUND® approval press announcement).

4.      Compounded products sold as "tirzepatide," meanwhile, are not approved or even reviewed by the FDA.  Pharmacies currently offering compounded versions of tirzepatide are not required to follow the FDA's "good manufacturing practices," nor to comply with the same controls on sterility and safe storage as manufacturers of FDA-approved medicines. They are also not required to report adverse events—an important regulatory requirement imposed on manufacturers of FDA-approved medicines for patient safety.  Compounded drugs are not tested for safety, quality, or efficacy in clinical trials.  Accordingly, and as the FDA has warned, "compounded drugs pose a higher risk to patients than FDA-approved drugs," such as MOUNJARO® and ZEPBOUND®.  https://www.fda.gov/drugs/human-drug-compounding/drug-compounding-and-drug-shortages (FDA explainer on Drug Compounding).

5.      Defendant falsely and unlawfully trades on Lilly's work, reputation, and goodwill, offering unproven and unapproved compounded drugs as if they were genuine Lilly medicines.  But Defendant does not offer Lilly's proprietary MOUNJARO® and ZEPBOUND® medicines.  Indeed, Defendant's drugs have undergone ***none*** of the rigorous studies or approval processes that Lilly's medicines have.  Passing Defendant's compounded drugs off as Lilly's MOUNJARO® and ZEPBOUND® is not merely deceptive—it's dangerous.

6.      Defendant's intentional deception begins with its eye-catching product description, wherein Defendant claims to offer a "Science Backed Weight Loss Prescription" that is "FDA Approved," as shown below.



7.      Despite this impossible-to-miss advertisement, Defendant's product is neither "science backed" nor "FDA approved."  Rather, it is untested, unapproved, and unsafe.

8.      Lilly therefore brings this action pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and for violation of Ohio statutory and common law regarding deceptive and unfair trade practices.  Lilly's claims arise out of Defendant's infringement of Lilly's rights in the MOUNJARO® and ZEPBOUND® trademarks and Defendant's acts of false designation of origin, false advertising, deceptive trade practices, and unfair methods of competition.

## THE PARTIES

9.      Plaintiff Lilly is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

10.     Defendant is an Ohio corporation d/b/a Lucy's Laser & Medspa, with a principal place of business in Concord, Ohio, in this District.  Defendant additionally does business at

3

8806 Mentor Avenue, Suite G, Mentor, Ohio 44060, also in this District.  Its registered agent is

Lucille Zappitelli Sason with a registered agent address 6726 Rosemarie Court, Concord, Ohio

44077.

11.     Defendant also does business using the domain name

"https://lucyslasermedspa.com."

**JURISDICTION AND VENUE**

12.     The Court has subject matter jurisdiction over the Lanham Act causes of action

pleaded herein pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a).  The Court has

supplemental jurisdiction over the state and common law causes of action pleaded herein

pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant

operates and conducts business in this District.  Defendant is subject to personal jurisdiction in

this District.

**LILLY'S FDA-APPROVED TIRZEPATIDE MEDICINES:
MOUNJARO® AND ZEPBOUND®**

14.     Lilly's MOUNJARO® is a novel treatment for type 2 diabetes, a chronic and

progressive condition facing more than 30 million Americans.  As the FDA has noted, "Despite

the availability of many medications to treat diabetes, many patients do not achieve the

recommended blood sugar goals."

https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-

announcements/fda-approves-novel-dual-targeted-treatment-type-2-diabetes (archived FDA

MOUNJARO® approval press announcement).  MOUNJARO® targets this problem head-on

using an innovative active pharmaceutical ingredient, tirzepatide.  Before it received FDA

approval, Lilly's MOUNJARO® was clinically proven to improve blood sugar control "more

4

effective[ly] than the other diabetes therapies with which it was compared in clinical studies." *Id.*

15.     The FDA approved MOUNJARO® and indicated it in addition to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.  As part of the approval process, Lilly submitted data on safety, quality, and effectiveness collected through clinical trials involving thousands of patients.  Lilly's MOUNJARO® is thus proven safe and effective when used as directed.

16.     In addition to MOUNJARO®, Lilly markets and sells ZEPBOUND®, another proprietary, FDA-approved treatment option containing the active pharmaceutical ingredient tirzepatide.  With ZEPBOUND®, Lilly aims to help the many dozens of millions of American adults with obesity or with excess weight and weight-related medical problems lower their risks of cardiovascular disease and other leading causes of death.  As the FDA has noted, ZEPBOUND® "addresses an unmet medical need" by targeting "chronic weight management (weight reduction and maintenance)" through a new method of hormone receptor activation. https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight-management (FDA ZEPBOUND® approval press announcement).

17.     As with MOUNJARO®, the safety, quality, and effectiveness of ZEPBOUND® was established through rigorous clinical trials featuring thousands of patients.  The FDA recently approved ZEPBOUND® and indicated it for adults with obesity (with a BMI of 30 kg/m2 or greater) or those who are overweight (with a BMI ≥ 27 kg/m2 or greater) and also have at least one weight-related additional condition, such as hypertension (high blood pressure), dyslipidemia (high cholesterol or fats in blood), type 2 diabetes mellitus, obstructive sleep apnea,

or cardiovascular disease, to lose weight.  It should be used with a reduced-calorie diet and increased physical activity.

18.     Lilly's tirzepatide medicines are the result of billions of dollars of investments in research and development, which included dozens studies and trials.

19.     Countless highly specialized personnel ensure Lilly medicines meet quality and safety standards.  Lilly manufactures its medicines under strict controls in state-of-the-art facilities.  Transforming tirzepatide API to medicine is a complex, methodical, and science-based process.  Lilly follows Good Manufacturing Practices (GMP), which are regulations that "provide[] for systems that assure proper design, monitoring, and control of manufacturing processes and facilities."  https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp (FDA explainer on GMP).  GMPs include "establishing strong quality management systems, obtaining appropriate quality raw materials, establishing robust operating procedures, detecting and investigating product quality deviations, and maintaining reliable testing laboratories."  *Id.*  GMPs help "prevent instances of contamination, mix-ups, deviations, failures, and errors."  *Id.*

20.     Each step in Lilly's process to manufacture its tirzepatide medicines—from sourcing and chemical synthesis of the API to formulation and device assembly and packaging—requires extensive testing and controls and specialized equipment.  Lilly's medicines must be, and always are, accompanied with important, FDA-approved labels, instructions, and warnings.

21.     Lilly now promotes, offers, and sells MOUNJARO® and ZEPBOUND® medicines in Ohio and throughout the United States.

## LILLY'S MOUNJARO® AND ZEPBOUND® TRADEMARKS

22.      Lilly uses the trademarks MOUNJARO® and ZEPBOUND® (the "Lilly Marks") to identify and promote Lilly's proprietary, FDA-approved medicines with the active pharmaceutical ingredient tirzepatide.  Lilly markets and sells MOUNJARO® and ZEPBOUND® throughout the United States using the Lilly Marks.

23.      Lilly first adopted and used the MOUNJARO® mark at least as early as June 3, 2022, and has used the MOUNJARO® mark continuously since that time.  Lilly has extensively promoted, advertised, and marketed its prescription-only diabetes medicine bearing the MOUNJARO® mark in many different channels, directed both to healthcare professionals and to patients.

24.      Lilly is the owner of two federal trademark registrations for MOUNJARO®, U.S. Reg. Nos. 6,809,369 (issued August 2, 2022) and 7,068,463 (issued May 30, 2023).  True and correct copies of Plaintiff Lilly's registrations for the MOUNJARO® mark are attached hereto as part of **Exhibit A.**  Lilly additionally has several pending applications to register its MOUNJARO® mark in connection with more classes, services, and goods, including U.S. Trademark Ser. Nos. 97/596,856, 97/668,206, and 98/253,743.  As a result of its use of the MOUNJARO® mark, Lilly also owns valuable common law and other rights in and to the MOUNJARO® mark.

25.      Lilly first adopted and used the ZEPBOUND® mark at least as early as November 30, 2023, and has used the ZEPBOUND® mark continuously since that time.  Lilly has extensively promoted, advertised, and marketed its prescription-only weight-loss medicine bearing the ZEPBOUND® mark in many different channels, directed both to healthcare professionals and to patients.

26.    Lilly is the owner of one federal trademark registration for ZEPBOUND®, U.S. Reg. No. 7,288,373 (issued January 23, 2024).  A true and correct copy of Plaintiff Lilly's registration for the ZEPBOUND® mark is attached hereto as part of **Exhibit A.**  Lilly additionally has several pending applications to register its ZEPBOUND® mark, including U.S. Trademark Ser. Nos. 97/530,451, 97/530,456, and 98/295,137.  As a result of its use of the ZEPBOUND® mark, Lilly also owns valuable common law and other rights in and to the ZEPBOUND® mark.

27.    Lilly conceived the Lilly Marks to stand out in the marketplace.  The Lilly Marks do not describe any attributes of either medicine and are accordingly inherently distinctive.

28.    Lilly promotes, advertises, and markets MOUNJARO® and ZEPBOUND® both to healthcare professionals and to patients, among others, through various channels, including on the websites mounjaro.com, mounjaro.lilly.com, zepbound.com, and zepbound.lilly.com, in social media, in online advertisements, and on television.

29.    As a result of Lilly's use, promotion, advertising, and marketing of MOUNJARO® and ZEPBOUND®, the Lilly Marks are exclusively associated with Lilly, serve to identify genuine Lilly products, and are valuable assets of Lilly.

## THE RISKS OF COMPOUNDING

30.    Upon information and belief, Defendant markets and sells to patients compounded drug products that purport to contain tirzepatide and that are not approved by the FDA or any other global regulatory agency ("Unapproved Compounded Drugs").

31.    Typically, prescription medicines must undergo a rigorous premarket approval process.  Federal law creates a narrow exception for compounding, which the FDA defines as a "practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters

ingredients of a drug to create a medication tailored to the needs of an individual patient."
https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding (FDA guidance on drug compounding law compliance).  This narrow exception applies, for instance, where a patient cannot safely take a commercially manufactured FDA-approved drug due to an allergy to a particular dye.

32.     The Food, Drug, and Cosmetic Act (FDCA), in section 503A, prescribes a rigid set of requirements that compounding pharmacies must meet, including a requirement that compounding occur only "on the prescription order that a compounded product is necessary for the identified patient."  This restriction is important because compounding pharmacies are not required to comply with GMP, so they are only permitted to produce a small amount based on the specific needs of specific patients.  The FDA has explained the importance of this requirement to ensure that compounding pharmacies "are not actually operating as conventional manufacturers":

> The longer a compounded sterile drug product that has been contaminated is held by a pharmacist or physician before distribution, or held in inventory in a health care facility before administration, the greater the likelihood of microbial proliferation and increased patient harm.  Because of these and other risks, the FD&C Act places conditions on compounding that must be met for compounded drugs to qualify for the exemptions in section 503A, [including that] compounding is for an identified individual patient, drugs compounded in advance of receiving prescriptions are compounded only in limited quantities, and drugs are distributed pursuant to a valid patient-specific prescription.  These conditions are meant to help ensure that compounding under section 503A is based on individual patient needs, and that entities purportedly operating under section 503A are not actually operating as conventional manufacturers.

https://www.fda.gov/media/97347/download (FDA prescription requirement compliance guidance for industry).

33.     As the FDA further explained, "The *prescription requirement* under section 503A is a critical mechanism to distinguish compounding by a licensed pharmacist or licensed

9

physician from conventional manufacturing, and to ensure that drug products compounded under

section 503A, which are not FDA-approved, are not subject to the requirement that labeling bear

adequate directions for use, and are not subject to []GMP requirements, are provided to a patient

only based on individual patient need." *Id.* (emphasis in original).

34.     Compounders are also limited in their ability to engage in a practice called

anticipatory compounding, which is when, "based on a history of receiving prescriptions for a

particular drug product to be compounded for an identified individual patient, and in the context

of an established relationship with a particular prescriber or patient, a pharmacist or physician

will compound a batch of drugs in anticipation of receiving another patient-specific prescription.

The compounder then provides the drugs to a patient or health care provider when a prescription

for an identified individual patient is received." *Id.*  As the FDA further explained:

> [A]nticipatory compounding [] has risks.  For example, if a problem occurs during
> compounding, such as contaminating a drug product that is supposed to be sterile,
> or producing subpotent or superpotent sterile or non-sterile drugs, it could affect
> numerous patients, and not just one.  Because drug products compounded in
> accordance with section 503A are exempt from CGMP requirements, there is an
> inherently greater chance of a production mistake or contamination.  Restricting
> anticipatory compounding to limited quantities serves to limit the number of
> patients likely to be affected if there are drug product mix-ups or contamination.
> The limitations on anticipatory compounding in section 503A (i.e., compounding
> must be in "limited quantities" and based on an "established relationship") help to
> protect patients from product quality issues.  ***These limitations on anticipatory***
> ***compounding also help to distinguish licensed pharmacists or licensed***
> ***physicians compounding drug products under section 503A for individual***
> ***patients from conventional manufacturers, who generally produce larger***
> ***quantities of drugs that are distributed without a prescription***.

*Id.* (emphasis added).

35.     According to the FDA, "[c]ompounded drugs are not FDA-approved.  This means

that FDA does not review these drugs to evaluate their safety, effectiveness, or quality before

they reach patients."  The FDA has warned that: "Compounded drugs . . . do not have the same

safety, quality, and effectiveness assurances as approved drugs.  Unnecessary use of

compounded drugs unnecessarily exposes patients to potentially serious health risks.  Because compounded drugs are not FDA-approved, FDA does not verify their safety, effectiveness, or quality before they are marketed."  https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers (FDA drug compounding FAQ).

36.     Health risks from compounded drugs are serious.  In 2021, a pharmacist pled guilty to providing adulterated compounded drugs to cataract surgery patients.  The adulterated compounds contained "an excessive amount of an inactive ingredient" that can damage sensitive eye tissue.  https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/press-releases/texas-pharmacist-pleads-guilty-adulterating-drug-used-cataract-surgeries (FDA press announcement re guilty plea).  At least 68 patients were injected with the adulterated compounds, at two different surgery centers, over a period of months, even though patients suffered near-immediate adverse events, including permanent blindness.  https://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (WFAA article re outbreak).  One patient had believed "every pill you take, every shot you take is tested" and was surprised to learn that compounded drugs were neither fully tested nor deemed safe or otherwise approved by the FDA.  *Id.*

37.     There are countless other examples of people experiencing serious injury from taking unregulated medicines.  Inappropriate drug compounding caused at least 73 reported compounding errors between 2001 and 2019.  These errors led to more than 1,562 adverse events and at least 116 deaths.  https://www.pewtrusts.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19 (U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001–19).

38.     Lilly has seen problems first-hand for compounded tirzepatide.  Lilly has discovered compounded drugs advertised as tirzepatide with safety, sterility, and efficacy problems.  Some contain bacteria, high impurity levels, different colors (pink, instead of colorless), or a chemical structure different from the tirzepatide in Lilly's FDA-approved medicines.  In at least one instance, Lilly saw nothing more than sugar alcohol.  Lilly also has received reports of patients experiencing significant adverse events after being injected with non-Lilly tirzepatide, including a patient who experienced a seizure and was admitted to the Intensive Care Unit and other patients who experienced severe allergic reactions.  According to the FDA's Adverse Events Reporting System (FAERS), to date, over 150 adverse events associated with compounded or so-called (but not actually) "generic" tirzepatide have been reported, including over 100 "serious cases" and at least 5 deaths.

39.     Consequences from compounded drugs may be deadly.  In October 2012, compounded drugs contaminated with a fungus were shipped throughout the country and later injected into patients' spines and joints.  After these contaminated products were injected into nearly 14,000 patients, more than 60 people died of fungal meningitis.  *Id.*  Regarding this outbreak, the FDA has written:

> The 2012 fungal meningitis outbreak was not an isolated event. It was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs. In addition, many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then. And, because most compounders do not report adverse events to FDA, the agency may not be aware of adverse events associated with compounded drugs unless a health care provider submits an adverse event report regarding his or her patients or a state official notifies FDA.

https://www.fda.gov/media/102493/download (FDA Compounding Progress Report).

## WIDESPREAD SAFETY CONCERNS
## ABOUT COMPOUNDED TIRZEPATIDE

40.     Regulators and law enforcement across the United States and abroad have

recognized the safety concerns with compounded tirzepatide and other incretins.  They have

issued warnings, and in at least one instance, banned incretin compounding.

41.     The FDA, for example, has consistently and repeatedly raised its concerns with

compounding generally and compounded incretins more specifically.

https://www.fda.gov/media/97347/download (FDA prescription requirement compliance

guidance for industry).  The FDA specifically has targeted compounded tirzepatide as a threat to

consumer safety.  The Director of the FDA's Office of Unapproved Drugs and Labeling

Compliance has issued multiple warning letters to compounding pharmacies purportedly selling

compounded tirzepatide products because they are not safe or effective.

https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-

letters/us-chem-labs-669074-02072024 (FDA warning letter re US Chem Labs);

https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-

letters/synthetix-inc-dba-helix-chemical-supply-668918-02072024 (FDA warning letter re

Synthetix Inc. DBA Helix Chemical Supply).

42.     Across the country, at least nine state pharmacy boards, along with several state

poison centers, have issued guidance and warnings regarding the risks to patients of compounded

incretins.  The Alabama Board of Pharmacy notified all licensed pharmacists and pharmacies

that "even when compounding of [incretins] is allowable under [federal law], . . . the use of any

non-pharmaceutical grade active pharmaceutical ingredient (API), or one not produced by an

FDA-registered establishment, is prohibited."  https://www.albme.gov/press-release/concerns-

with-semaglutide-and-other-glp-1-receptor-agonists (Alabama Board of Medical Examiners

press release).  And the Maryland Poison Control Center warned that buying compounded

incretins "online puts people at risk due to the medicine not being regulated and/or being sold

from a source that is not licensed," including because those compounded products "have not

been evaluated for safety and effectiveness by the FDA."

https://blog.mdpoison.com/2024/03/semaglutide (Blog of the Maryland Poison Center).

      43.    The issue of unsafe compounded drugs purporting to contain tirzepatide has also

received international attention.  Australia recently banned the development and sale of

compounded anti-obesity medications because of "increasing community concern" and

"increasing reports of patients coming to harm from" compounded incretin drugs.  The ban—

effective October 2024—targets compounded drugs that are "being misrepresented and sold as

replica [] Mounjaro®."  https://www.health.gov.au/ministers/the-hon-mark-butler-

mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products

(Australia Minister for Health and Aged Care press release).  As Mark Butler, Australia's

Minister for Health, said, "Australians should be able to have faith in the medications they use,

including compounded medicines," and the ban "will protect Australians from harm and save

lives."  *Id.*

      44.    Doctors and patient groups recognize the problems with compounded incretins,

and they are sharing their concerns, too.  The Obesity Society, Obesity Action Coalition, and

Obesity Medicine Association, for example, issued a joint statement warning that when people

use incretin "alternatives, you may not be getting what you hoped for.  You may also get

something you did not want (other active substances have been found in some compounded

versions)."  https://www.obesityaction.org/wp-content/uploads/GLP-1-Compounded-

Alternative-Statement_Final_Logos-1.pdf (joint statement from leading obesity expert organizations).

45.     Lilly itself has issued multiple public warnings about compounded tirzepatide, including by publishing an open letter.

**DEFENDANT'S FALSE ADVERTISING
AND TRADEMARK INFRINGEMENT**

46.     Lilly does not sell MOUNJARO® or ZEPBOUND® to Defendant for resale or redistribution.  Nor has Lilly authorized Defendant to use the Lilly Marks in connection with any of Defendant's offered goods or services.  On information and belief, therefore, the Unapproved Compounded Drugs sold by Defendant are made by compounding pharmacies, which deliver them to Defendant for prescription, administration, or other dispensing to patients.

47.     On information and belief, Defendant does not sell Lilly's MOUNJARO® and ZEPBOUND® and has no association with Lilly.  Yet Defendant boldly and falsely appropriates the Lilly Marks to market and sell Unapproved Compounded Drugs purporting to contain tirzepatide.  These drugs are ***not*** MOUNJARO® or ZEPBOUND®.  Rather, Defendant passes off Unapproved Compounded Drugs as "Zepbound, Mounjaro."  Defendant's unlawful use of the Lilly Marks can only be intended to deceptively lure in patients in pursuit of revenues and profits.

48.     Because Defendant is not offering genuine MOUNJARO® or ZEPBOUND®, Lilly has no control over the safety, quality, or effectiveness of the Unapproved Compounded Drugs sold by Defendant.

49.     Defendant also passes off as "Mounjaro" its own Unapproved Compounded Drugs for a use for which it is not approved or indicated, namely "weight loss."

50.     Examples of Defendant's trademark infringement and false advertising are shown below and are attached hereto as **Exhibit B**.

51.     An example of Defendant's unauthorized use of the Lilly Marks, on its Tirzepatide webpage (https://lucyslasermedspa.com/tirzepatide), is shown below.

> **What is Tirzepatide?**                                          ^
>
> Tirzepatide (Zepbound, Mounjaro) is used for weight loss and type 2 diabetes in adults. Tirzepatide is a GIP and GLP-1 receptor agonist and works for weight loss by decreasing your appetite and slowing the movement of food from the stomach into the small intestine, which may make you feel full more quickly and for a longer period of time. Tirzepatide also decreases blood sugar levels by increasing insulin production and lowering the amount of sugar the liver makes.

52.     As the image shows, Defendant promotes its Unapproved Compounded Drugs with the explanation that they are "Zepbound, Mounjaro."

53.     Defendant's website conveys the unmistakable impression that Defendant is offering for sale a product that either is, has the same source as, or is the same as, Lilly's MOUNJARO® and ZEPBOUND®. But Lilly is the only approved source of MOUNJARO® and ZEPBOUND® in the United States, and Lilly does not sell either medicine to Defendant for resale or redistribution.

54.     Defendant first started using the Lilly Marks to advertise its Unapproved Compounded Drugs long after Lilly had adopted them. Defendant's use can only have been intended to benefit from the goodwill Lilly generated around the Lilly Marks.

55.     Defendant also falsely advertises its Unapproved Compounded Drugs on its website by making statements that claim or imply that its Unapproved Compounded Drugs are FDA-approved and have been proven to achieve certain therapeutic outcomes. These statements

rely on the FDA's approval of **Lilly's** medicines and clinical trials for **Lilly's** medicines.  These studies and approvals have no bearing on, and cannot substantiate claims about, Defendant's Unapproved Compounded Drugs, which upon information and belief are sold without having undergone any clinical trials on safety and effectiveness.

56.     For example, as shown below, Defendant's "Tirzepatide" webpage advertises that: "Tirzepatide is FDA-approved for weight loss."  "Tirzepatide," however, is **not** approved for weight loss or any other condition; Lilly's MOUNJARO® and ZEPBOUND®, medicines **containing** tirzepatide, are FDA approved for the indications described above.

> Tirzepatide is FDA-approved for weight loss for adults with obesity or who are overweight and have weight-related medical problems. Tirzepatide helps you to lose weight and maintain weight loss and should be combined with diet and exercise.
>
> Tirzepatide is given as weekly injections under the skin and are available as single-dose pens in the same strengths 2.5 mg, 5 mg, 7.5 mg, 10 mg, and 12.5 mg.

57.     Additionally, as shown above, Defendant claims to offer its Unapproved Compounded Drugs in "single-dose pens" in doses corresponding to FDA-approved dosages of MOUNJARO® and ZEPBOUND®, which can only be construed as a reference to Lilly's MOUNJARO® and ZEPBOUND® autoinjector pens.  Defendant does not, however, offer Lilly's MOUNJARO® and ZEPBOUND®, in autoinjector pen or any other form.

58.     In fact, Defendant stated in an October 26, 2023 Instagram post that Defendant gets its "tirzepatide from trusted United states Compounding pharmacies **only**." https://www.instagram.com/p/Cy3On4mLgC7/ (emphasis added).

59.     In another Instagram post, from December 13, 2023, Defendant referred to "studies" that allegedly proved the safety, quality, or effectiveness of Defendant's Unapproved Compounded Drugs.  These "studies," however, were conducted on *Lilly's* medicines and do not prove anything about Defendant's Unapproved Compounded Drugs.

60.     Upon information and belief, these statements are false and/or misleading as to Defendant's Unapproved Compounded Drugs, which are *not* "FDA approved," were *not* subjected to clinical trials, and therefore are *not* "clinically proven" to achieve any results.

61.     Defendant continues to use the Lilly Marks, including in advertising and promotion on its website, to deceive patients who, upon information and belief, are seeking to buy but are in fact not buying genuine FDA-approved MOUNJARO® and/or ZEPBOUND® to treat their serious health conditions.

62.     Defendant's prominent and misleading use of the Lilly Marks is likely to cause consumers to falsely believe that they are purchasing MOUNJARO® and/or ZEPBOUND®, that Defendant is a source for Lilly's FDA-approved treatment options MOUNJARO® and/or ZEPBOUND®, that Defendant's Unapproved Compound Drugs are as safe and effective as Lilly's FDA-approved treatment options MOUNJARO® and ZEPBOUND®, and/or that Defendant's services are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

63.     Defendant's use of the Lilly Marks is without the permission, consent, or authorization of Lilly.  Defendant has no right to use, and Defendant knows that it has no right to use, the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs or otherwise.  Defendant's advertising and promotional materials are false and misleading where

they suggest and/or state an association with Lilly's FDA-approved MOUNJARO® and

ZEPBOUND®, because no such association exists.

64.    There is no need for Defendant to use the Lilly Marks to advertise or promote its

Unapproved Compounded Drugs purporting to contain tirzepatide, other than to trade upon

Lilly's reputation and to create confusion in the marketplace and/or mislead patients with serious

health conditions regarding the origin, identity, or source of Defendant's Unapproved

Compounded Drugs.

65.    Defendant's unauthorized use of the Lilly Marks is intended—and likely—to

cause confusion, to cause mistake, or to deceive, and infringes Lilly's established exclusive

rights in the Lilly Marks.

66.    Upon information and belief, unless enjoined by this Court, Defendant will

continue to use the Lilly Marks and/or otherwise falsely advertise its Unapproved Compounded

Drugs as associated with or being MOUNJARO® and ZEPBOUND®, all in violation of Lilly's

rights.

## **HARM TO THE PEOPLE OF OHIO AND LILLY**

67.    Lilly's FDA-approved MOUNJARO® and ZEPBOUND® medications have

undergone extensive clinical trials and approval processes.  But these clinical studies and FDA

approvals only apply to genuine Lilly MOUNJARO® and ZEPBOUND® used as directed by a

prescribing physician.  The clinical trials and approval processes do not inform the safety,

quality, or effectiveness of Defendant's Unapproved Compounded Drugs.

68.    Defendant's unlawful, misleading business model may expose patients to the

serious risks described above.  Critically, because Defendant falsely advertises and, without

Lilly's consent, uses the Lilly Marks in connection with its Unapproved Compounded Drugs,

patients are unlikely to know the unique risks associated with Defendant's untested, unapproved drugs.

69.     Defendant advertises itself as providing MOUNJARO® and ZEPBOUND® (or their supposed equivalents), when in reality Defendant provides untested Unapproved Compounded Drugs.  Defendant's promotional tactics are ***intended*** to mislead patients into believing that Unapproved Compounded Drugs are backed by clinical trials and have been approved by the FDA, when no such studies have been conducted, and neither the FDA nor any other regulatory body has approved them.  Patients who take Defendant's Unapproved Compounded Drugs and suffer harm will have had no forewarning.

70.     Not only does this deceitful content expose the people of Ohio to serious health risks, but Defendant's unlawful tactics undermine the name, goodwill, and reputation that Lilly has invested heavily in developing.  Moreover, Defendant's unfair methods allow it and its suppliers of Unapproved Compounded Drugs to unjustly profit from sales to patients looking for MOUNJARO® and ZEPBOUND®.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**in Violation of 15 U.S.C. § 1114**

71.     Lilly repeats and realleges each and every allegation above as if fully set forth herein.

72.     Lilly is the owner of all right, title, and interest in federal trademark registrations for the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement under 15 U.S.C. § 1114.

73.     Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's

unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

74. Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive, and thus constitute trademark infringement of the registered Lilly Marks, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

75. Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks. The actions of Defendant alleged above have at all times relevant to this action been willful.

76. As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged. Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill. This harm constitutes an injury for which Lilly has no adequate remedy at law.

77. This is an exceptional case under 15 U.S.C. § 1117.

78. Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

## SECOND CAUSE OF ACTION
### Trademark Infringement, False Designation of Origin and Unfair Competition in Violation of 15 U.S.C. § 1125

79. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

80. Lilly is the owner of all right, title, and interest in the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125.

81.     Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

82.     Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant, and thus constitute trademark infringement, false designation of origin, and unfair competition with respect to the Lilly Marks, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

83.     Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks.  The actions of Defendant alleged above have at all times relevant to this action been willful.

84.     As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged.  Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill.  This harm constitutes an injury for which Lilly has no adequate remedy at law.

85.     This is an exceptional case under 15 U.S.C. § 1117.

86.     Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**THIRD CAUSE OF ACTION**
**False and Misleading Advertising and Promotion**
**in Violation of 15 U.S.C. § 1125(a)(1)(B)**

87.     Lilly repeats and realleges each and every allegation above as if fully set forth herein.

88.     Defendant's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

89.     Defendant has knowingly and willfully made material false and misleading statements in its commercial advertisements for its Unapproved Compounded Drugs, and these statements regarding Unapproved Compounded Drugs' safety, quality, effectiveness, and regulatory status have influenced and are likely to continue to influence consumers' purchasing decisions.

90.     Defendant's statements—including its various literally false claims—have the tendency to deceive a substantial segment of consumers, who have relied or likely will rely on Defendant's false statements in making their tirzepatide-based medicine purchase decisions.

91.     Defendant has caused its false statements to enter interstate trade or commerce.

92.     As a direct and proximate result of Defendant's false and deceptive campaign, Lilly is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

93.     As a direct and proximate result of Defendant's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Lilly to Defendant and Defendant's suppliers and by a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® and the Lilly Marks.

94.     This is an exceptional case under 15 U.S.C. § 1117.

95.     Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**FOURTH CAUSE OF ACTION**
**Deceptive Trade Practices**
**in Violation of Ohio Rev. Code § 4165.01 *et seq*.**

96.     Lilly repeats and realleges each and every allegation above as if fully set forth herein.

97.     The above-described acts of Defendant constitute deceptive trade practices in violation of Ohio Rev. Code § 4165.01 et seq.

98.     Among other things, Ohio Rev. Code § 4165.02 defines actions that constitute a "deceptive trade practice" as including, but not limited to, the following:

(1)  Passes off goods or services as those of another;
(2)  Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
(3)  Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
                    *         *         *
(7)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
                    *         *         *
(9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
                    *         *         *
(11) Advertises goods or services with intent not to sell them as advertised;

99.     As set forth herein, Defendant's actions fit within the scope of Ohio Rev. Code § 4165.02.

100.    Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's

unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

101.    Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive the public and consumers as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant, and thus constitute deceptive trade practices with respect to the Lilly Marks, in violation of Ohio Rev. Code § 4165.01 *et seq.*

102.    Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks.  The actions of Defendant alleged above have at all times relevant to this action been willful with the intent to deceive.

103.    Defendant's actions additionally include deceptively relying on Lilly's clinical trials for MOUNJARO® and ZEPBOUND® to advertise Defendant's Unapproved Compounded Drugs.  These representations amount to false assurances of the safety, quality, and effectiveness of Defendant's Unapproved Compounded Drugs.  Defendant's false and misleading misrepresentations and omissions were material because they involve information that would be important to consumers, and therefore, likely their use of, or conduct, regarding Defendant's Unapproved Compounded Drugs.

104.    As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged.  Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill.  This harm constitutes an injury for which Lilly has no adequate remedy at law.

105. Members of the public are also likely to suffer injury from the above-described acts of Defendant by purchasing a drug that they believe to be genuine MOUNJARO® and ZEPBOUND®, not an Unapproved Compounded Drug.

106. Under the principles of equity, Lilly is entitled to entry of preliminary and permanent injunctive relief. In addition, Lilly is entitled to attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**Trademark Infringement and Unfair Competition**
**in Violation of Ohio Common Law**

107. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

108. The above-described acts of Defendant constitute trademark infringement and unfair competition in violation of Ohio common law.

109. Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks to pass off its Unapproved Compounded Drugs purporting to contain tirzepatide as genuine MOUNJARO® and ZEPBOUND®.

110. Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant.

111. Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

112. Defendant's actions thereby unfairly and wrongfully exploit and infringe Lilly's trademark, goodwill, and reputation.

113.    As a direct and proximate result of Defendant's trademark infringement and unfair methods of competition, Lilly has suffered and will continue to suffer significant monetary damages and a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® medicines and the Lilly Marks.  Defendant therefore has unfairly profited from the actions alleged.

114.    By reason of Defendant's acts, Lilly's remedy at law is not adequate to compensate for the injuries inflicted by Defendant.  Accordingly, Lilly is entitled to entry of preliminary and permanent injunctive relief in addition to monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1.    An Order declaring that Defendant:

    a.   Infringed the federally registered Lilly Marks, in violation of 15 U.S.C. § 1114(1);

    b.   Infringed the Lilly Marks and engaged in trademark infringement, false designation of origin, and unfair competition, in violation of 15 U.S.C. § 1125(a)(1)(A);

    c.   Engaged in false and misleading advertising and promotion, in violation of 15 U.S.C. § 1125(a)(1)(B);

    d.   Engaged in deceptive trade practices, false advertising, unfair competition, and trademark infringement in violation of Ohio Rev. Code § 4165.01 *et seq.* and Ohio common law;

    e.   That each of the above acts was willful and knowing.

2.      An injunction preliminarily and then permanently enjoining and restraining Defendant and its officers, agents, servants, employees, and attorneys and all persons acting in concert or participation with any of them, from:

       a.   Using the Lilly Marks or any mark confusingly similar to them, in connection with the advertising, promoting, marketing, selling or offering for sale of any goods or services (including, but not limited to, Unapproved Compounded Drugs) or otherwise engaging in any activity that is likely to cause confusion, cause mistake, or deceive or otherwise infringe any rights of Plaintiff Lilly in the Lilly Marks or any similar mark;

       b.   Falsely stating or suggesting that Defendant's Unapproved Compounded Drugs are genuine or generic versions of MOUNJARO® or ZEPBOUND®, that Defendant is associated or connected in any way with Plaintiff or its products, or that Defendant's Unapproved Compounded Drugs are approved by the FDA, have been the subject of clinical studies, or achieve certain therapeutic outcomes;

       c.   Engaging in any unfair competition with Plaintiff Lilly; and

       d.   Engaging in any deceptive or unfair acts.

3.      An Order Requiring Defendant and its officers, agents, servants, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that Defendant is not and never has been authorized by, affiliated with, sponsored by, approved by, or related to Plaintiff Lilly or MOUNJARO® and ZEPBOUND®, that Defendant's Unapproved Compounded Drugs are not

MOUNJARO® or ZEPBOUND®, that Defendant's Unapproved Compounded Drugs are not generic MOUNJARO® or generic ZEPBOUND®, that Defendant's Unapproved Compounded Drugs have never been genuine or generic versions of MOUNJARO® and ZEPBOUND®,  and that Defendant's Unapproved Compounded Drugs are not and have never been approved or reviewed by the FDA or tested for safety, quality, or effectiveness in clinical trials.

4.      An Order directing Defendant to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the Court's injunction.

5.      An Order requiring Defendant to account for and pay to Lilly any and all profits arising from the foregoing acts of infringement, false designation of origin, false advertising, and deceptive trade practices.

6.      An Order requiring Defendant to pay Lilly compensatory damages in an amount as yet undetermined caused by the foregoing acts of infringement, false designation of origin, false advertising, and unfair competition, and trebling such compensatory damages for payment to Lilly in accordance with 15 U.S.C. § 1117 and other applicable laws.

7.      An Order for pre-judgment and post-judgment interest on all damages.

8.      An Order requiring Defendant to pay Lilly all types of monetary remedies available under Ohio state law in amounts as of yet undetermined caused by the foregoing acts of infringement, false designation of origin, false advertising, and unfair competition.

9.      An Order requiring Defendant to pay Lilly's costs and attorney's fees in this action pursuant to 15 U.S.C. § 1117, Ohio state law, and any other applicable provision of law.

10.     Other relief as the Court may deem appropriate.

Dated:  June 20, 2024

Respectfully submitted,

*/s/ Matthew J. Cavanagh*

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: (216) 348-5400 s
Facsimile: (216) 348-5474
mcavanagh@mcdonaldhopkins.com

Joshua L. Simmons (*pro hac vice* forthcoming)
Jeanna M. Wacker (*pro hac vice* forthcoming)
Ashley Ross (*pro hac vice* forthcoming)
Joshua C. Berlowitz (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com
ashley.ross@kirkland.com
josh.berlowitz@kirkland.com

Diana M. Watral (*pro hac vice* forthcoming)
James F. Hurst (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
diana.watral@kirkland.com
james.hurst@kirkland.com

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*

## JURY DEMAND

Lilly hereby demands a jury trial for all issues so triable.

*/s/ Matthew J. Cavanagh*

Matthew J. Cavanagh (OH 0079522)
*Attorney for Plaintiff*
*ELI LILLY AND COMPANY*